UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

CHEY DAVIS,

                Plaintiff,                        Case No. 1:22-cv-12319

v.                                          Honorable Thomas L. Ludington
                                                United States District Judge

DELTA COLLEGE and JEAN GOODNOW,

                Defendants.

_____/

**ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT AND DISMISSING CASE**

For over fifteen years, Jean Goodnow[1] served as President of Delta College. During that time, some faculty and staff, including tenured English Professor Chey Davis, took issue with Goodnow's decisions and described the workplace environment as "toxic." In 2018, Davis—a Black woman—applied for a promotion to Full Professor. But Goodnow—a Caucasian woman—denied Davis's promotion application, citing her low student-evaluation scores.

After Goodnow retired, Delta College's new President, Michael Gavin, a former vice president at a Maryland community college, rereviewed Davis's promotion application, disagreed with Goodnow's analysis of her student-evaluation scores, and retroactively promoted Davis to Full Professor with back pay. A few months later, Davis left teaching to pursue a career in social work and sued both Goodnow and Delta College in August 2022, alleging they denied her promotion application because of her race and in retaliation for her delivery of a petition to Goodnow seeking a unionization vote.

---

[1] Goodnow's full name is Mary Jean Goodnow, *see* ECF No. 17-2 at PageID.120, but all pleadings in this case identify her as Jean Goodnow.

**I.**

In 1961, Defendant Delta College ("Delta") opened its doors as a community college to students in Bay, Midland, and Saginaw Counties. *See Facts and Figures*, DELTA COLLEGE, https://www.delta.edu/about-us/factsfigures.html (last visited Feb. 1, 2024) [https://perma.cc/2W SP-CQQC]. In 2005, Defendant Jean Goodnow became President of Delta, a role she remained in until her retirement in 2021. ECF No. 17-2 at PageID.126–27. During Defendant Goodnow's tenure as Delta's President, she received several awards from local NAACP chapters and Delta's Black Faculty Association. *Id.* at PageID.159. Yet Defendant Goodnow's leadership style was described by her successor, Michael Gavin, as a "toxic top-down bullying kind of environment," ECF No. 17-5 at PageID.385, a view he adopted after a two-month "overlap" working with Defendant Goodnow and through talking with faculty and staff after his arrival in 2022, *id.* at PageID.393.

In 2007, Defendants hired Plaintiff Chey Davis as an English instructor. ECF No. 17-3 at PageID.212. Plaintiff, who is a Black woman, *id.* at PageID.213, was promoted to assistant professor in 2010, received tenure[2] in 2012, and was promoted to associate professor in 2014. ECF No. 17-4 at PageID.326. In 2019, she became eligible for a promotion to Full Professor. *See* ECF No. 17-8 at PageID.519–20 (detailing "minimum qualifications for promotion from Associate Professor to Full Professor").

Plaintiff alleges that throughout her employment with Delta, Defendant Goodnow's

---

[2] Historically, academic tenure is rooted in the idea that "scholars must be free from outside interference" by "established religious and political authorities." Sara Dillon, *On Academic Tenure and Democracy: The Politics of Knowledge*, 52 UIC J. MARSHALL L. REV. 937, 956 (2019). To that end, a tenured professor enjoys protection "from retribution for the results of their research, for what they say and teach in class, for their actions in fulfilling their duties in university governance, and for their extramural utterances." Mark L. Adams, *The Quest for Tenure: Job Security and Academic Freedom*, 56 CATH. U. L. REV. 67, 70 (2006).

"treatment of Black faculty and staff was very stark and unsupportive" and that Defendant Goodnow engaged in "microaggressions [toward her] on the campus, in campus meetings, and in the halls." ECF No. 17-3 at PageID.215–16. These microaggressions included Defendant Goodnow ignoring Plaintiff, *id.* at PageID.216, and directing a human resources officer and the police department to contact Plaintiff after Plaintiff opposed a policy change impacting the promotion and tenure process by stating the policy change made her feel "unsafe." *Id.* at PageID.216.

During the 2018 summer semester, some Delta faculty decided to initiate a vote to unionize. ECF No. 17-3 at PageID.223. Three faculty members, including Plaintiff, personally notified Defendant Goodnow of the faculty's intent to hold a vote to unionize by delivering the unionization petition to Goodnow. *Id.* Before the vote, Defendants worked with Chris Curtis, a faculty member who had been elected to be the incoming chair of the union, to "devise[] memorandums of understanding" regarding potential union structure and terms.[3] ECF No. 17-2 at PageID.139.

During the 2018 fall semester, Plaintiff began the process of applying for promotion to Full Professor. Under Delta's promotion procedures, a faculty member who would like to be considered for promotion must first consult with their division chair, who "advise[s] the candidate in preparing the necessary data." ECF No. 17-8 at PageID.520. The division chair then organizes and leads a meeting involving all divisional faculty, who consider each candidate's application and vote whether to recommend the candidate for promotion. *Id.* A two-thirds majority is required for a promotion recommendation. *Id.* If the division recommends promotion, the division chair will submit the candidate's name "to the appropriate academic dean with the chair's written

---

[3] The faculty eventually voted to unionize, though the first union contract was signed after Plaintiff terminated her employment with Delta. *See* ECF No. 17-3 at PageID.223.

recommendation." *Id.* At this point, the "chief academic officer . . . convene[s] division chairs for the purpose of reviewing [division] recommendations." *Id.* at PageID.521. Then, the division chairs "furnish an advisory recommendation" on the candidate to "the appropriate academic dean." *Id.* After the appropriate academic dean receives each division chair's recommendation, the appropriate academic dean reviews the candidate's application and submits it to the chief academic officer with a recommendation. *Id.* Then, the chief academic officer reviews the candidate's application and submits it to the president with a recommendation. *Id.* The president then reviews the candidate's application, "add[s] recommendations[,]" and submits the candidate's application to the Board of Trustees for final consideration. *Id.* The Board of Trustees makes the final decision, but, if the Board disagrees with the President's promotion recommendation, the Board's reasoning will be communicated to the candidate. *Id.* At each level in the evaluation process, those who review the candidate's application are to consider the candidate's profile, personal appraisal, teaching effectiveness, educational and professional growth, productive activity for the college, and leadership. ECF No. 17-9 at PageID.526–27.

On April 5, 2019, Defendant Goodnow informed Plaintiff that her promotion review would be delayed according to Delta College's Senate Policy 3.010(F)(9) because although Plaintiff had "demonstrated [her] educational and professional growth," Defendant Goodnow had "concerns" about Plaintiff's demonstrated leadership and her "teaching effectiveness," specifically Plaintiff's "personal, physical contact with a  student" that was noted in a teaching observation and a "lack of feedback" from Plaintiff's students. ECF No. 17-13 at PageID.548. Accordingly, Defendant Goodnow asked that Plaintiff "consider sharing with [Defendant Goodnow] [Plaintiff's] student feedback, including comments, from 2015 – 2019." *Id.* Around this same time, Plaintiff applied to Michigan State University's Master of Social Work program because she

intended to retire from Delta in 2032 and then "transition to practicing [social work] full time" after her retirement. ECF No.17-3 at PageID.272–73; *see also* ECF No. 25 at PageID.903.

On June 4, 2019, Defendant Goodnow again delayed her review of Plaintiff's promotion application because Plaintiff had not provided "any of the requested student evaluations" nor additional information "that demonstrate[d] [Plaintiff's] leadership at the level of full professor." ECF No. 17-15 at Page552. Later that month, Goodnow received Plaintiff's "Student Feedback Summary." S*ee generally* ECF No. 17-16.

In Defendant Goodnow's view, Plaintiff's Student Feedback Summary revealed a "pattern of consistently negative comments from students one semester after another after another after another . . . regarding the teacher effectiveness, the content of what was being taught, regarding her being late for class and . . . her material being used not relating to [college requirements]." ECF No. 17-2 at PageID.162. When asked "what suggestions do you have for improving this course, if any?" on the student evaluation form, some students responded that Plaintiff should "teach more about [E]nglish and how to write," and Plaintiff should "[p]ertain the class more to English vs. [h]istory." ECF No. 17-10 at PageID.529. Many student comments also mentioned that Plaintiff was slow to grade papers, *see id.* at PageID.532 ("I'd like papers to be graded at a decent time because I didn't know my grade at all on any assignments [s]o I don't know how I'm doing in the class."), and that she did not follow the class schedule, *id.* at PageID.534 ("Get a new professor who cares about the schedule enough to follow it."). True, Plaintiff received positive feedback from some students, *see id.* at PageID.532 ("The teacher helped me learn a new way to write a research paper."), at PageID.533 ("Ms. Davis was very helpful, she is very concerned about her students learning."), but, on average, Plaintiff's student evaluation scores were lower than those faculty members who were promoted to Full Professor. ECF No. 17-5 at PageID.395.

On August 14, 2019, Defendant Goodnow informed Plaintiff that her promotion application was denied because the student feedback and peer observations "demonstrate[d] ability" but not "excellence in teaching effectiveness." ECF No. 17-17 at PageID.583. Defendant Goodnow also noted that Plaintiff's student evaluation scores were "trending downward over the last five years" in two English courses. *Id.*

Eight days later, Plaintiff filed a grievance alleging that Defendant Goodnow "improperly denied [her] promotion application" because Defendant Goodnow "applied a different standard for 'demonstrated leadership' to her application" and "requested to review all of [Plaintiff's] student evaluations and not the summary of student feedback called for by the promotion process." ECF No. 17-18 at PageID.585.

The Delta College Grievance Committee[4] reviewed the submitted written materials, heard testimony from "both parties," and ultimately concluded that "reexamination" of Plaintiff's promotion application was warranted because the requirement that a candidate "demonstrate leadership" does not specify or qualify that said leadership must be within Delta. ECF No. 17-19 at PageID.588.

One month later, in December 2019, Defendant Goodnow sent a "Memorandum" informing Plaintiff that her promotion application was denied "at this time" because "the student feedback and observations of the peer review committee demonstrates ability but does not provide the evidence of [Plaintiff] attaining a level of excellence in teaching effectiveness required for full professor." ECF No. 17-14 at PageID.550. Defendant Goodnow encouraged Plaintiff to apply for

---

[4] The details of how the Grievance Committee was assembled is not in the record, but Plaintiff and Defendant Goodnow agree that it is assembled according to a Delta Senate Policy. According to Plaintiff, the Grievance Committee is a "senate committee" composed of Delta College faculty and staff. ECF No. 17-3 at PageID.244. And according to Defendant Goodnow, the Grievance Committee is composed of eleven Delta College Faculty and Staff selected to serve on the committee.  ECF No. 17-2 at PageID.149.

promotion again in the future and "suggest[ed]" that Plaintiff "work with [her] Associate Dean to identify some leadership opportunities within [Plaintiff's] discipline . . . and to work with the [Faculty Center for Teaching Excellence] to strengthen [her] teaching focus." *Id.* The record does not reflect that Plaintiff engaged in any further pursuit of Full Professorship.

In August 2021, Defendant Goodnow retired. ECF No. 17-2 at PageID.127. Dr. Michael Gavin was hired as the next President, and he and Goodnow worked together during a two-month transition period. *Id.* Gavin, who was previously the Vice President of Learning at Anne Arundel Community College in Arnold, Maryland, "disagreed" with Defendant Goodnow's decision to deny Plaintiff's promotion application. ECF No. 17-5 at PageID.384. Gavin believed leadership could be demonstrated by community leadership off campus and because he interpreted the student evaluation scores differently. *Id.* Specifically, Gavin considered Plaintiff's student evaluation scores with the added context that Plaintiff "was teaching developmental English and she was also teaching controversial subjects." *Id.* Accordingly, on January 28, 2022, Gavin promoted Plaintiff to Full Professor with retroactive back pay to July 1, 2019. ECF No. 17-20 at PageID.591–92. Later that year, Plaintiff graduated with her Master of Social Work from Michigan State University. ECF No. 17-3 at PageID.208. On June 30, 2022, Plaintiff resigned. *See* ECF Nos. 17-3 at PageID.209; 17-21 at PageID.594.

On August 17, 2022, Plaintiff sued Defendants in Saginaw County Circuit Court. ECF No. 1 at PageID.6. She alleged Defendants discriminated against her on the basis of her race and sex, both violations of Michigan's Elliott-Larsen Civil Rights Act, and that Defendants retaliated against her for public statements she made on campus in support of the faculty's unionization vote. *See id.* at PageID.13–17. One year later, the Parties stipulated to dismiss Plaintiff's sex-discrimination claim, ECF No. 20, and both Defendants filed motions seeking summary judgment

on Plaintiff's two remaining claims, ECF Nos. 17; 21. Plaintiff opposes both motions. ECF Nos. 25; 26.

## II.

A motion for summary judgment should be granted if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The movant has the initial burden of "identifying" evidence in the record "it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the opposing party who must set out specific facts showing "a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (citation omitted). A genuine issue of fact requires more than "a mere scintilla of evidence," *id.* at 251, and more than "some metaphysical doubt," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

The court must draw all reasonable inferences in favor of the nonmovant to determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52.

Summary judgment will be granted if the nonmovant fails to establish a genuine issue of material fact on the elements of its case that the moving party has challenged. *See Celotex Corp.*, 477 U.S. at 322. But summary judgment will be denied if the challenged elements have "genuine factual issues that . . . may reasonably be resolved in favor of either party." *Hancock v. Dodson*, 958 F.2d 1367, 1374 (6th Cir. 1992) (citation omitted).

## III.

After the stipulated dismissal of Plaintiff's sex-discrimination claim under the ELCRA, *see* ECF No. 20, only two claims remain. Plaintiff alleges both Defendants violated the ELCRA by

- 8 -

discriminating against her because of race (Count 1) and that both Defendants deprived her First Amendment rights by retaliating against her activity in support of unionization, in violation of 42 U.S.C. § 1983 (Count III). ECF No. 1 at PageID.13–17. Each claim will be discussed below.

### A.

Beginning with Plaintiff's ELCRA claim, Plaintiff alleges she was discriminated against because of her race when she was denied a promotion to Full Professor.

### 1.

Under the ELCRA, an employer may not "[f]ail or refuse to hire or [to] recruit, discharge, or otherwise discriminate against an individual with respect to employment, compensation, or a term, condition, or privilege of employment, because of religion, *race*, color, national origin, age, sex, height, weight, or marital status." MICH. COMP. LAWS § 37.2202(1)(a) (emphasis added). In mixed-motive cases, where the adverse action is based on both legitimate and unlawful reasons, the "plaintiff must prove that the defendant's discriminatory animus was more likely than not a 'substantial' or 'motivating' factor." *Sniecinski v. BCBS of Mich.*, 666 N.W.2d 186, 192–93 (Mich. 2003). Discriminatory treatment may be proven with either direct or indirect, circumstantial evidence. *Id.*

Direct evidence, "if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Id.* (quoting *Hazle v. Ford Motor Co.*, 628 N.W.2d 515, 520 (Mich. 2001)). By contrast, indirect-evidence claims apply the burden-shifting framework from *McDonnell Douglas*. *Id.* at 193. A *prima facie* indirect-evidence case requires the plaintiff to prove she (1) "belongs to a protected class," (2) "suffered an adverse employment action," (3) "was qualified for the position," and (4) failed "to obtain the position . . . under circumstances giving rise to an inference of unlawful discrimination." *Id.* A plaintiff can satisfy

the fourth element by demonstrating she was "treated differently from similarly situated employees outside the protected class." *Mitchell v. Vanderbilt Univ.*, 389 F.3d 177, 181 (6th Cir. 2004).

"If the plaintiff succeeds in establishing a prima facie [indirect-evidence] case," then the burden "shifts to the employer to articulate a legitimate, nondiscriminatory rationale." *In re Rodriguez*, 487 F.3d 1001, 1008 (6th Cir. 2007) (citing *Hazle*, 628 N.W.2d at 521–22). If the employer does so, then "the burden shifts back to the plaintiff to demonstrate that the articulated reason is a mere pretext." *Id.* (citing *Hazle*, 628 N.W.2d at 522). The employer's proffered reasons are pretext if they "(1) had no basis in fact, (2) were not the actual factors motivating the decision, *or* (3) were insufficient to justify the decision." *Cuddington v. United Health Servs., Inc.,* 826 N.W.2d 519, 526 (Mich. Ct. App. 2012) (per curiam) (emphasis added) (citing *Dubey v. Stroh Brewery Co.*, 462 N.W.2d 758, 760 (Mich. Ct. App. 1990) (per curiam)).

## 2.

All Parties agree that this case involves indirect evidence, so it must be analyzed under the *McDonnell-Douglas* burden-shifting framework. *See* ECF No. 17 at PageID.99 ("[Plaintiff] has no direct evidence of race discrimination."); ECF No. 21 at PageID.677 ("Plaintiff's claim is based on circumstantial evidence rather than direct evidence."); ECF No. 25 at PageID.905–16 (applying the *McDonnell-Douglas* burden-shifting framework to Plaintiff's ELCRA claim).

Both Defendants argue that Plaintiff was not treated differently than similarly situated people outside of her protected class, thus she has not stated a *prima facie* claim for race discrimination under the ELCRA, and Defendant Delta adds that Plaintiff did not suffer an adverse employment action. *See* ECF Nos. 17 at PageID.100–06; 21 at PageID.677–86. Both disputed elements will be discussed in turn.

**i.**

Plaintiff alleges she suffered an adverse employment action because she was constructively discharged when she was not promoted to a full professor. *See* ECF No. 25 at PageID.910–11. But both Defendants argue that Plaintiff was not constructively discharged such that it qualifies as an adverse employment action. *See* ECF No. 17 at PageID.100–03; ECF No. 21 at PageID.684–86. And, although Defendant Goodnow admits that the promotion denial alone is an adverse employment action, ECF No. 17 at PageID.100, Defendant Delta College argues that, because it retroactively promoted Plaintiff, Plaintiff's "[d]iscrimination claim[] therefore cannot be based upon that rescinded action." ECF No. 21 at PageID.679.

**a.**

"Michigan law recognizes constructive discharge as an adverse employment action." *Agnew v. BASF Corp.*, 286 F.3d 307, 309 (6th Cir. 2002) (citing *Champion v. Nationwide Security, Inc.*, 545 N.W.2d 596 (Mich.1996)). "A constructive discharge occurs when an employer deliberately makes an employee's working conditions so intolerable that the employee is forced to involuntarily resign or, stated differently, when working conditions become so difficult or unpleasant that a reasonable person in the shoes of the employee would feel compelled to resign." *Tudor v. Macomb Cnty.*, No. 353221, 2021 WL 2026116, at *11 (Mich. Ct. App. May 20, 2021) (citing *Jewett v. Mesick Consolidated Sch. Dist.*, 957 N.W.2d 377, 384 (Mich. Ct. App. 2020)). Once an employee establishes constructive discharge, "they are treated as if their employer had actually fired them." *Champion v. Nationwide Sec., Inc.*, 545 N.W.2d 596, 600 (Mich. 1996), overruled on other grounds by *Hamed v. Wayne Cnty.*, 803 N.W.2d 237 (Mich. 2011). "Where reasonable persons could reach different conclusions regarding whether these elements are established, the issue becomes a question of fact for the jury and not one properly decided by the

trial court." *Vagts v. Perry Drug Stores, Inc.*, 516 N.W.2d 102, 105 (1994).

Plaintiff argues that she was "mistreated and ultimately passed over for a promotion," in 2019 which "amounted to a constructive discharge," more than two years later when she decided to resign from her position at Delta College and pursue a career as a psychotherapist. ECF No. 25 at PageID.910 (emphasis omitted); *see also id.* at PageID.905. According to Plaintiff, "years of macro- and micro-aggressions at the hands of [Defendant] Goodnow . . . culminated in a significant way in 2019, when Goodnow denied Davis's application for promotion." *Id.* at PageID.911. But, as Defendants point out, Plaintiff does not identify any working conditions that were "so difficult or unpleasant" after her December 2019 promotion denial "that a reasonable person . . . would feel *compelled* to resign." *Tudor v. Macomb Cnty.*, No. 353221, 2021 WL 2026116, at *11 (Mich. Ct. App. May 20, 2021) (emphasis added). To the contrary, Plaintiff had no contact with Defendant Goodnow between December 2019 and June 2022. ECF No. 17-2 at PageID.211, 248. And after Defendant Goodnow's 2021 retirement, the only conditions Plaintiff cites are the general "climate" of Delta and her view that Dr. Gavin would at times "appear dismissive of concerns of specifically the Black faculty and staff, and sometimes faculty overall." ECF No. 17-3 at PageID.274. But a subjective dissatisfaction with decisions made by leadership, without more, does not rise to the level of working conditions *so* difficult or unpleasant that an employee feels *compelled* to resign.

In sum, no reasonable juror could conclude that Plaintiff's promotion denial in 2019 and ongoing microaggressions by Defendant Goodnow that ended in 2021 were "so difficult or unpleasant" that Plaintiff felt *compelled* to resign when, in fact, she continued to work until 2022. Thus, Plaintiff may not proceed on her first adverse employment action theory of constructive discharge.

**b.**

Turning to Plaintiff's second adverse employment action theory, "[d]enial of a promotion is an adverse employment action." *Lulaj v. Wackenhut Corp.*, 512 F.3d 760, 765 (6th Cir. 2008) (citing Williams v. Pharmacia, 137 F.3d 944, 948 (7th Cir.1998)); *see also Hazle v. Ford Motor Co.*, 628 N.W.2d 515, 523 (Mich. 2001) (finding plaintiff suffered an adverse employment action when "she did not receive the promotion for which she was denied.").

Defendant Goodnow concedes that denial of a promotion is an adverse employment action. ECF No. 17 at PageID.100. But Defendant Delta asserts that a "rescinded action" may not be the basis for a discrimination claim. ECF No. 21 at PageID.679. Plaintiff responds that Defendant Delta's retroactive promotion two years later "does not fully undo the initial discriminatory action" because "[t]he loss of income for a two-year period itself is enough to constitute and adverse action." ECF No. 25 at PageID.909.

Despite Defendant Delta's retroactive promotion of Plaintiff with back pay two years after Plaintiff was denied promotion, the original December 2019 promotion denial is an adverse employment action for purposes of stating a substantive race-discrimination claim under Michigan's ELCRA. In *Dobbs-Weinstein v. Vanderbilt Univ.*, 185 F.3d 542 (6th Cir. 1999), the Sixth Circuit held that a delayed grant of tenue to a professor was not an adverse employment action where "the final layer of plaintiff's tenure review process reversed" an earlier unfavorable decision that was *not* the final decision. *Dobbs-Weinstein v. Vanderbilt Univ.*, 185 F.3d 542, 545 (6th Cir. 1999). Defendant Delta attempts to rely on *Dobbs-Weinstein* to argue that its retroactive promotion of Defendant *25 months* after its original "final decision" rescinds any adverse employment action. *See* ECF No. 21 at PageID.680–82. Plaintiff responds by invoking *White v. Burlington N. & Santa Fe Ry.*, 364 F.3d 789 (6th Cir. 2004) (*en banc*), which rejected the "ultimate

- 13 -

employment decision" standard in *Dobbs-Weinstein*. *See* ECF No. 25 at PageID.907–08. But neither case is dispositive here. *Burlington* rejected the ultimate employment decision standard in the context of *retaliation* claims, *not* discrimination claims, as is at issue here. *See also White v. Dep't of Transportation*, 964 N.W.2d 88, 99 (Mich. Ct. App. 2020) (adopting the *Burlington* reasonable-employee standard for determining whether an employer has committed an adverse employment action under the ELCRA *in the retaliation context*). Importantly, the ELCRA's substantive discrimination provision includes more "limiting language" than its antiretaliation provision. *Id.* Under the substantive discrimination provision—which is at issue here—an adverse employment action must affect "employment, compensation, or a term, condition, or privilege of employment." MICH. COMP. LAWS § 37.2202(1)(a). And although the Sixth Circuit found that the plaintiff in *Dobbs-Weinstein* did not suffer an adverse employment action that affected the terms and conditions of her employment because there was not yet a final decision, the facts in *Dobbs-Weinstein* are reasonably distinguishable. Unlike in *Dobbs-Weinstein*, the Defendants here had rendered a final employment decision denying Plaintiff's promotion application. Plaintiff had already filed a grievance, and the denial of her promotion was not rescinded until *25 months* later. This adverse employment action was not "very temporary," such that it is a "de minimus employment action" rendering Plaintiff's claim not actionable. *Kubik v. Cent. Michigan Univ. Bd. of Trustees*, 221 F. Supp. 3d 885, 907 (E.D. Mich. 2016) (finding no adverse employment action where the adverse employment decision was reversed before plaintiff suffered any "tangible harm.") (collecting cases).

In sum, Defendant's denial of Plaintiff's promotion application is an adverse employment action, despite a retroactive promotion 25 months later. Although Defendant Delta's eventual reversal of its December 2019 decision may impact damage calculations if its original decision

*was* because of race discrimination, such a delayed reversal may not absolve an employer of liability for unlawful discrimination altogether. Thus, Plaintiff has successfully established an adverse employment action on the basis of her denial of a promotion.

### ii.

Turning to the fourth element of the ELCRA's indirect-evidence framework, Defendants next argue that Plaintiff has not proved that she was "treated differently from similarly situated employees outside the protected class," *Mitchell v. Vanderbilt Univ.*, 389 F.3d 177, 181 (6th Cir. 2004), because the four similarly situated employees she identifies are not similarly situated and because Defendants "applied the same standard of review to [Plaintiff's] promotion packet that [they] did to all other candidates, including the proposed comparators." ECF No. 17 at PageID.106; *see also* ECF No. 21 at PageID.682–83. Plaintiff responds that her proposed comparators were similarly situated to her but were treated differently. ECF No. 25 at PageID.914–15.

"A plaintiff may prove disparate treatment by showing that she was a member of a protected class and that she was treated differently than members of a different class for the same or similar conduct." *McIntire v. Michigan Inst. of Urology,* No. 311599, 2014 WL 265519, at *3 (Mich. Ct. App. Jan. 23, 2014). In order to "show that a differently treated coworker was 'similarly situated,' all *relevant* aspects of plaintiff's employment situation must be nearly identical to the coworker's employment situation." *Id.* (quoting *Town v. Mich. Bell Tel. Co.*, 568 N.W.2d 64 (1997)) (emphasis added).

Plaintiff focuses on two comparators to whom she alleges she was similarly situated: Ray Lacina and Betheen Glady-Teschendorf. *See* ECF No. 25 at PageID.914–16. Both Lacina and Glady-Teschendorf were non-Black English professors. *Id.* at PageID.914–15. But both Lacina and Glady-Teschendorf differ from Plaintiff in an important way: both had higher average student

evaluation scores than Plaintiff, and both had scores that more closely aligned with Defendant Goodnow's criteria of student-evaluation scores predominantly in and above the 90th percentile. ECF No. 17-2 at PageID.152. Indeed, as Defendant Goodnow emphasizes, Lacina scored "**no lower** than 92.3%" on all but one student-evaluation question, and Glady-Teschendorf's student-evaluation scores fell below 90% on only two questions. ECF No. 27 at PageID.1564 (emphasis in original). By contrast, Plaintiff's student-evaluation scores, though not aggregated in her promotion packet like the scores in Lacina's and Glady-Teschendorf's promotion applications, are much lower. Plaintiff scored above 90% on only 10 of 22 questions after the Winter 2015 semester, nine of 22 questions after the Fall 2016 semester, five of 22 questions after the Winter 2016 semester, and two of 22 questions after the Fall 2017 semester. *See* ECF No. 17-16. And Plaintiff's former-student-evaluation scores, though only a small sample size, surpassed 90% on *one question*, and the rest of her former-student-evaluation scores fell somewhere between 67% and 83%. *See* ECF No. 17-4 at PageID.366–67. In this way, Plaintiff is not similarly situated to the alleged comparators because the student-evaluation scores of each proposed comparator is a *relevant aspect* of each professor's employment situation.[5] Thus, Plaintiff has not shown disparate treatment.

In sum, Plaintiff has not stated a prima facie case of race discrimination under Michigan's ELCRA because she has not shown that she received disparate treatment because of her race. Accordingly, both Defendants' Motions for Summary Judgment will be granted as to Count I.

---

[5] To the extent Plaintiff takes issue with how her student evaluation scores were interpreted, her argument that the scores were interpreted incorrectly does not change the analysis, as the factual dispute in employment discrimination cases is whether discriminatory animus motivated the employer, not whether the employer was correct or competent. *White v. Dep't of Transportation*, 964 N.W.2d 88, 94 (Mich. Ct. App. 2020) (citing *Hazle v. Ford Motor Co.*, 628 N.W.2d 515 (Mich. 2001)). Moreover, Plaintiff has not shown that any of her comparators had scores as low as or lower than her scores that were interpreted differently.

**B.**

Plaintiff next alleges Defendants deprived her of her First Amendment rights, in violation of 42 U.S.C. § 1983, by retaliating against her for her delivery of a faculty-unionization petition to Defendant Goodnow.

**1.**

"To establish a *prima facie* case of First Amendment retaliation, a public employee must show that (1) he engaged in constitutionally protected speech or conduct; (2) the employer took an adverse action against him that would deter an ordinary person from engaging in that conduct; and (3) the protected speech was a substantial or motivating factor in the adverse action." *Laster v. City of Kalamazoo*, 746 F.3d 714, 733 (6th Cir. 2014) (citing *Scarbrough v. Morgan Cnty. Bd. Of Educ.*, 470 F.3d 250, 255 (6th Cir. 2006); *Farhat v. Jopke*, 370 F.3d 580, 588 (6th Cir. 2004)).

In order to prove that an employee's protected speech was a "substantial or motivating factor" in an employer's decision to take an adverse employment action against that employee, the employee must identify specific, nonconclusory allegations that reasonably link the protected speech to the adverse employment action. *Vereecke v. Huron Valley Sch. Dist.*, 609 F.3d 392, 400 (6th Cir. 2010) (citing *Rodgers v. Banks*, 344 F.3d 587, 602 (6th Cir. 2003)). The Sixth Circuit has found that, in order for protected speech to be a motivating factor within this framework, the plaintiff must show that their protected speech was a "but-for cause—'without which the [adverse employment] action being challenged simply would not have been taken.'" *Leonard v. Robinson*, 477 F.3d 347, 355 (6th Cir. 2007) (quoting *Greene v. Barber*, 310 F.3d 889, 897 (6th Cir. 2002)).

**2.**

Both Defendants argue Plaintiff has not shown that her alleged protected speech was "a

- 17 -

substantial or motivating factor" in denying her promotion. *Laster v. City of Kalamazoo*, 746 F.3d 714, 733 (6th Cir. 2014); *see also* ECF Nos. 17 at PageID.110 (emphasis omitted); 21 at PageID.691. Defendants argue that the only protected speech Plaintiff has identified—her delivery of petition to vote on unionization to Defendant Goodnow—occurred over a year before her promotion denial, and that there is no other evidence to infer a causal link between the two events. ECF No. 17 at 110; *see also* ECF No. 21 at PageID.691 (noting that Defendant Delta "joins and incorporates by reference" Defendant Goodnow's arguments as to why there is no causation evidence). Plaintiff responds that "[t]here is more than sufficient circumstantial evidence in this case to create a question of fact for the jury." ECF No. 25 at PageID.919. She relies on her characterization of Defendant Goodnow's "angry" reaction to Plaintiff's delivery of the petition for unionization 16 months before Plaintiff was denied a promotion, *id.*, and an English professor's conclusory declaration detailing her own "strong[] belie[f]" that Defendant Goodnow called Plaintiff and others "troublemakers" because of their involvement in the faculty's unionization effort, ECF No. 25-10 at PageID.1322.

Plaintiff has not pointed to any specific, nonconclusory allegations linking her speech—her summer 2018 delivery of union petition to Defendant Goodnow—to Defendants' denial of her promotion in December 2019. Thus, she has not shown the causation her First Amendment retaliation claim requires.

Plaintiff may not rely on temporal proximity to establish causation here because the time between the delivery of the unionization petition and the denial of her promotion—more than a year—is too removed to establish causation on its own. *Kenney v. Aspen Techs.,* Inc., 965 F3d 443, 449 (6th Cir. 2020) (holding a two-and-a-half month lapse in time between protected activity and adverse employment action "is not, standing alone, a convincing case for proving causation.")

(citing *Vereecke v. Huron Valley Sch. Dist.*, 609 F.3d 324, 401 (6th Cir. 2010)).

Although "a mere lapse in time between the protected activity and the adverse employment action does not inevitably foreclose a finding of causality," the remaining record evidence does not establish causation. *Dixon v. Gonzales*, 481 F.3d 324, 335 (6th Cir. 2007). Plaintiff asserts that Defendant Goodnow's reaction to the delivery establishes that the delivery was a substantial or motivating factor in her promotion denial. ECF No. 25 at PageID.898. Plaintiff testified that Defendant Goodnow was "extraordinarily angry and growled" when Plaintiff and two others dropped off the unionization petition, ECF No. 17-3 at PageID.219, and that she believed that the faculty's unionization efforts resulted in Defendant Goodnow's "sense of anger and acrimony toward the faculty continu[ing] throughout that semester[.]" *Id.* at PageID.225. But a display of anger 16 months before an adverse employment action, during an interaction that lasted "probably not more than two minutes," ECF No. 17-2 at PageID.136, without more, does not establish causation.

True, Plaintiff also cites the declaration of Karen Randolph, an English professor at Delta College who was the chair of Plaintiff's promotion committee and was "heavily involved in the formation of the faculty union" at Delta. ECF No. 25-10 at PageID.1322. But Randolph's declaration does little more than provide her subjective, conclusory opinions about Defendant Goodnow's opinions about the unionization efforts overall. Randolph declared that she could "confidently say that Dr. Goodnow was not a supporter of the faculty's decision to unionize, and that Ms. Davis sharing this petition with Dr. Goodnow played a significant role in Dr. Goodnow's decision to deny [Plaintiff] the promotion." *Id.* But the *only* evidence she provides in support of her conclusory statement is that she "witnessed or experienced [Defendant] Goodnow referring to [Plaintiff], [Randolph], and Chris Curtis as 'The Troublemakers,'" and that she 'strongly believe[s]

- 19 -

that this label was given to [them] out of [Defendant] Goodnow's distaste for [their] union activities." *Id.* And Plaintiff does not identify any evidence—such as *when* Defendant Goodnow started calling the three "troublemakers" or the context in which the alleged statement was said— to support a conclusion that Defendant Goodnow called the three "troublemakers" *because of* Plaintiff's delivery of the petition[6] to unionize such that it may create a causal link between their delivery of the petition and the promotion denial 16 months later. This is especially true in light of the fact that there is "an obviously nonretaliatory basis for [Defendants'] decision" to deny Plaintiff's promotion: her student evaluation scores. *See Vereecke v. Huron Valley Sch. Dist.*, 609 F.3d 392, 401 (6th Cir. 2010). As discussed earlier, Plaintiff's student evaluation scores were much lower than all her proposed comparators who received a promotion to Full Professor. *See supra* Section III.A.2.ii. And though Plaintiff disagrees with Defendants' interpretation of her student evaluation scores, she has not shown that the interpretation of her scores was motivated in retaliation for her delivery of the unionization petition.

In sum, "[t]he absence of close temporal proximity and the presence of an obviously nonretaliatory basis for the defendants' decision amount to insufficient evidence to permit an inference of retaliatory motive." *Vereecke v. Huron Valley Sch. Dist.*, 609 F.3d 392, 401 (6th Cir. 2010). Accordingly, Defendants' Motions for Summary Judgment will be granted as to Plaintiff's First Amendment retaliation claim.

## C.

In sum, Plaintiff has not established a *prima facie* case of race discrimination in violation

---

[6] Notably, according to Randolph's declaration, one of the people who delivered the unionization petition in summer 2018 with Plaintiff—Donna Gulianni—was not called a "troublemaker" by Defendant Goodnow. *See* ECF No. 17-3 at PageID.219 (noting Donna Gulliani was one of the three people, including Plaintiff, who delivered the unionization petition to Defendant Goodnow in summer 2018).

of Michigan's ELCRA, nor has she established a *prima facie* case of First Amendment retaliation.

Thus, both Defendants' Motions for Summary Judgment, ECF Nos. 17; 21, will be granted.

**IV.**

Accordingly, it is **ORDERED** that Defendant Goodnow's Motion for Summary Judgment, ECF No. 17, is **GRANTED**.

Further, it is **ORDERED** that Defendant Delta College's Motion for Summary Judgment, ECF No. 21, is **GRANTED**.

Further, it is **ORDERED** that the above captioned case is **DISMISSED**.

**This is a final order and closes the above-captioned case**.

Dated: February 2, 2024                                    s/Thomas L. Ludington
                                                                       THOMAS L. LUDINGTON
                                                                       United States District Judge